## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Feb 18 2020, 7:06 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Katharine Vanost Jones
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re: The Termination of the Parent-Child Relationship of J.H. and D.J.;

J.J. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

February 18, 2020

Court of Appeals Case No. 19A-JT-1544

Appeal from the Vanderburgh Superior Court

The Honorable Brett J. Niemeier, Judge

The Honorable Renee Allen Ferguson, Magistrate

Trial Court Cause No. 82D04-1810-JT-1961 82D04-1810-JT-1962

**Pyle, Judge.**

# Statement of the Case

J.J. ("Mother") appeals the termination of the parent-child relationship with her children, J.H. ("J.H..") and D.J. ("D.J.") (collectively "the children"), claiming that the Department of Child Services ("DCS") failed to prove by clear and convincing evidence that: (1) there is a reasonable probability that the conditions that resulted in the children's removal or the reasons for placement outside Mother's home will not be remedied; (2) a continuation of the parent-child relationship poses a threat to the children's well-being; and (3) termination of the parent-child relationship is in the children's best interests. Concluding that there is sufficient evidence to support the trial court's decision to terminate the parent-child relationships, we affirm the trial court's judgment.[1]

We affirm.

# Issue

Whether there is sufficient evidence to support the involuntary termination of Mother's parental rights.

# Facts

Mother is the parent of daughter P.R., who was born in October 2009; son D.R., who born in February 2011; son J.H., who was born in June 2013; and

---

[1] The children's fathers voluntarily relinquished their parental rights and are not parties to this appeal.

son D.J., who was born in March 2016. This appeal concerns only sons J.H. and D.J.

[4] In July 2014, the State charged Mother with felony domestic battery against J.H.'s father, J.E. ("J.E."). Mother pleaded guilty and was ordered to complete a domestic battery intervention program, which she did not do. In June 2015, before the birth of D.J., the State charged Mother with domestic battery against D.J.'s father, E.J. ("E.J."), in the presence of a child under sixteen.

[5] In July 2015, Mother called 911 and reported that her three children saw an intoxicated E.J. punch her in the face and head, push her, drag her around the house, and kick her in the back several times while she was on the ground. When police arrived, E.J. told the officers that Mother had choked him with a belt and had hit him several times.

[6] The following month, August 2015, pursuant to the terms of an informal adjustment with DCS, the trial court ordered Mother and E.J. to: (1) contact DCS weekly; (2) allow a family case manager or other service providers to make announced or unannounced visits to the home; (3) allow a family case manager to enter the home; (4) enroll in programs recommended by DSC or other service providers; (5) maintain suitable housing; and (6) complete a domestic violence assessment. In December 2015, DCS reported that Mother and E.J. had substantially complied with terms of the informal adjustment and did not request a continuation of it.

[7] In February 2017, Mother called 911 and reported that E.J. was intoxicated and "causing problems." (Ex. Vol. 2 at 42). Specifically, she reported that he had poked Mother in the forehead and had slapped her daughter in the face. Police officers were dispatched to the scene. When the officers arrived, E.J. told them that Mother had hit him with her phone.

[8] Two days later, based on a police report of the dispatch, DCS assigned Family Case Manager William Wargel ("FCM Wargel") to assess the family. FCM Wargel went to the family's home and knocked at the door. When the parents eventually opened the door, FCM Wargel observed them to have slurred speech and glassy eyes. The family case manager asked Mother and E.J. if they were under the influence of alcohol or drugs, and the parents told him to "fuck off" and shut the door in his face. (Tr. Vol. 2 at 106). FCM Wargel contacted law enforcement because he was concerned about the children in the home with intoxicated parents. Parents tested positive for THC and an opioid. FCM Wargel observed that the home had no bedding or furniture for the children.

[9] In an attempt to keep the children in the home, FCM Wargel referred parents to the Homebuilders program. Although parents initially agreed to participate in the program, they attended only one session before the family disappeared. When FCM Wargel found the family three weeks later, he learned that the older children had not been to school during that time. In addition, all the children were dirty and had a strong odor. They said they were hungry and had not eaten that day.

[10] The children were removed from the home, and DCS filed petitions alleging that the children were in need of services ("CHINS"). J.H. and D.J. were adjudicated to be CHINS in March 2017. In a dispositional order, the trial court ordered mother to: (1) complete a domestic violence assessment and follow all treatment recommendations; (2) complete a substance abuse assessment and follow treatment recommendations; (3) remain drug and alcohol free; (4) submit to urine drug screens; (5) obtain and maintain suitable, safe, and stable housing; (6) obey the law; and (7) attend supervised visitation with the children.

[11] J.H. and D.J. returned home for a trial visit in June 2017. A DCS case worker stopped by Mother's home to check on the children and discovered that the home had no workable utilities. There was trash on the floor, clothing piled in the bathtub, and the toilets were backed up with feces, causing a foul odor in the house. In addition, there was no refrigerator or food in the house. The children were dirty and had bite marks from fleas or mosquitoes. Based on the conditions in the home, DCS removed J.H. and D.J. and placed them in foster care.

[12] In October 2017, Mother tested positive for methamphetamine and amphetamine. She also attended only six of twelve scheduled visits with the children from August to October 2017. DCS suspended the visits in November 2017 after D.J. contracted MRSA from E.J. during a visit. DCS requested that Mother and E.J. see a doctor and told them that visits would resume with a doctor's note that neither parent was contagious. Mother did not comply with

DCS's request. FCM Meredith further testified that the following month, the trial court told Mother it would reinstate visits after she had completed two consecutive drug screens that were negative. Mother did not complete two consecutive negative drug screens.

[13] In April 2018, Mother texted FCM Meredith and asked what "services that she needed to do to get her kids back." (Tr. Vol. 2 at 157). FCM Meredith responded that she needed to get stable housing and take urine drug screens. He asked Mother to come to his office at her earliest convenience for a drug screen. Later that day, he received the following text message from Mother: "I need clean pee." (Tr. Vol. 2 at 157). FCM Meredith responded that he thought the message had been sent to him by mistake. He later received a text saying that "[t]his was not [Mother]." (Tr. Vol. 2 at 158). Mother never submitted a drug screen. She was arrested for burglary in August 2018. She subsequently pleaded guilty to the charged offense and was sentenced to one year of probation.

[14] Based on Mother's noncompliance with the CHINS dispositional order, DCS filed petitions to terminate Mother's parental relationships with J.H. and D.J. in October 2018. At the three-day termination hearing in January, March, and April 2019, DCS Family Case Manager Brandon Meredith ("FCM Meredith") testified that he had been assigned to the case in July 2017 after the children had been removed from Mother for the second time. According to FCM Meredith, Mother had not complied with the CHINS dispositional order requirements and had not seen her children in over a year.

When asked whether Mother was likely to remedy the reasons requiring the removal of her children, FCM Meredith responded that she was not. Specifically, FCM Meredith explained as follows:

> Because [Mother] has had since 2017 to do services. I have told her services she needs to get done. I've given her repeated services over the years. She has shown little – really no interest in completing services. She has also not even talked to ask about her kids and how they're doing. So at this point I just don't see that she's going to complete any service and remedy any of the issues, especially with the housing situation. She's been to multiple homes over the last two years. When I say multiple, she's testified about five or more homes.

(Tr. Vol. 2 at 160-61). FCM Meredith also testified that it was in the children's best interests to have Mother's parental rights terminated. According to the family case manager, the children were in a loving and caring pre-adoptive home where they had stability. FCM Meredith also testified that although he remained the case manager on this case until February 2019, all communication for the case was routed through another case manager after Mother had threatened FCM Meredith's child.

Also at the hearing, CASA Deborah Gamache ("CASA Gamache") testified that she did not think it was likely that Mother would remedy the reasons requiring removal of her children. CASA Gamache also testified that it was in the children's best interest to have Mother's parental rights terminated because she had not developed skills to provide for the children.

In June 2019, the trial court issued a detailed order terminating Mother's parental rights. Mother now appeals the termination.

# Decision

Mother argues that there is insufficient evidence to support the termination of her parental rights. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re K.T.K.*, 989 N.E.2d 1225, 1230 (Ind. 2013). However, the law provides for termination of that right when parents are unwilling or unable to meet their parental responsibilities. *In re Bester*, 839 N.E.2d 143, 147 (Ind. 2005). The purpose of terminating parental rights is not to punish the parents but to protect their children. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

When reviewing the termination of parental rights, we will not weigh the evidence or judge the credibility of the witnesses. *K.T.K.*, 989 N.E.2d at 1229. Rather, we consider only the evidence and reasonable inferences that support the judgment. *Id*. Where a trial court has entered findings of fact and conclusions thereon, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* (citing Ind. Trial Rule 52(A)). In determining whether the court's decision to terminate the parent-child relationship is clearly erroneous, we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment. *Id.* at 1229-30.

A petition to terminate parental rights must allege:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

IND. CODE § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.*, 989 N.E.2d at 1231.

Here, Mother argues that there is insufficient evidence to support the termination of her parental rights. Specifically, she contends that the evidence is insufficient to show that there is a reasonable probability that: (1) the conditions that resulted in the children's removal or the reasons for placement outside Mother's home will not be remedied; and (2) a continuation of the parent-child relationship poses a threat to the children's well-being.

At the outset, we note that INDIANA CODE § 31-35-2-4(b)(2)(B) is written in the disjunctive. Therefore, DCS is required to establish by clear and convincing

evidence only one of the three requirements of subsection (B). *In re A.K.,* 924 N.E.3d 212, 220 (Ind. Ct. App. 2010). We therefore discuss only whether there is a reasonable probability that the conditions that resulted in the children's removal or the reasons for their placement outside Mother's home will not be remedied.

[23] In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, we engage in a two-step analysis. *In re E.M.,* 4 N.E.3d 636, 643 (Ind. 2014). We first identify the conditions that led to removal or placement outside the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* Habitual conduct may include parents' prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and a lack of adequate housing and employment. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013). The trial court may also consider services offered to the parent by DCS and the parent's response to those services as evidence of whether conditions will be remedied. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of her future behavior. *E.M.*, 4 N.E.3d at 643.

[24] Here, the children were removed from Mother's home because of neglect and Mother's drug use. Our review of the evidence reveals that at the time of the termination hearing, Mother had not completed the court-ordered requirements in the CHINS dispositional order. Specifically, she had not completed a domestic violence program or a substance abuse assessment. She had not remained alcohol and drug free or obtained suitable, safe, and stable housing. She had not seen her children in over a year, and she had failed to obey the law when she was arrested for burglary in August 2018. This evidence supports the trial court's conclusion that there was a reasonable probability that the conditions that resulted in the children's removal would not be remedied. We find no error.

[25] Mother also argues that there is insufficient evidence that the termination was in the children's best interests. In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*. In so doing, the court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of the parent-child relationship is proper where the child's emotional and physical development is threatened. *In re R.S.*, 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*. "'A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that continuation of the parent-child relationship is contrary to the child's best interest.'" *In re B.D.J.*, 728 N.E.2d 195, 203 (Ind. Ct. App. 2000) (quoting

*Matter of Adoption of D.V.H.*, 604 N.E.2d 634, 638 (Ind. Ct. App. 1992), *trans. denied, superseded by rule on other grounds*). Further, the testimony of the service providers may support a finding that termination is in the child's best interests. *McBride v. Monroe Cty. Office of Family and Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

[26] Here, our review of the evidence reveals that Mother has historically been unable to provide stability and supervision for her children and was unable to provide the same at the time of the termination hearing. In addition, FCM Meredith and CASA Gamache testified that termination was in the children's best interests. The testimony of these service providers, as well as the other evidence previously discussed, supports the trial court's conclusion that termination was in the children's best interests. There is sufficient evidence to support the terminations.[2]

[27] Affirmed.

May, J., and Crone, J., concur.

---

[2] Mother also argues that the "trial court failed to enter its judgment in imperative form under either subsection (i) or subsection (ii) of the statute inviting the Appellate Court to guess the grounds upon which the trial court entered its judgment." (Mother's Br. at 3). According to Mother, "by not entering a decision under either subsection (i) or subsection (ii), the trial court leaves it to the Appellate Court to determine not only whether DCS met its burden but also upon which section of the statute the trial court entered its judgment." ( Mother's Br. at 15). We disagree with Mother's characterization of the trial court's judgment. Specifically, our review of the trial court's order reveals that the trial court concluded that DCS had proved both subsection (i), that there is a reasonable probability that the conditions that resulted in the children's removal or the reasons for placement outside the children's home would not be remedied, and subsection (ii), that a continuation of the parent-child relationship posed a threat to the children's well-being. In addition, the trial court set forth specific facts in support of its conclusions. We find no error.